Opinion filed July 3, 2008











 
 
  
 
 







 
 
  
 
 




Opinion filed July 3, 2008

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                 ____________

 

                                                          No. 11-07-00279-CR

                                                    __________

 

                             RUBEN RAMIREZ VILLALVA, Appellant

                                                             V.

                                         STATE
OF TEXAS, Appellee

 



 

                                         On
Appeal from the 106th District Court

                                                          Gaines
County, Texas

                                                  Trial
Court Cause No. 06-3710

 



 

                                             M
E M O R A N DU M   O P I N I O N

The
jury convicted Ruben Ramirez Villalva of the offenses of murder, unauthorized
use of a motor vehicle, and possession of heroin.  The jury also found the
eight enhancement allegations to be true.  The jury assessed his punishment at
confinement for life for the murder conviction.  For the unauthorized use of a
motor vehicle and the possession offenses, the jury assessed his punishment at
confinement for twenty years and a fine of $10,000 each.  We affirm.








In
his first issue, appellant challenges the legal and factual sufficiency of the
evidence to support his conviction of murder. 
In order to determine if the evidence is legally sufficient, the
appellate court  reviews all of the evidence in the light most favorable to the
verdict and determines whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307, 319 (1979); Jackson v. State, 17 S.W.3d 664,
667 (Tex. Crim. App. 2000).  To determine if the evidence is factually
sufficient, the appellate court reviews all of the evidence in a neutral
light.  Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006)
(overruling in part Zuniga v. State, 144 S.W.3d 477 (Tex. Crim. App.
2004)); Johnson v. State, 23 S.W.3d 1, 10-11 (Tex. Crim. App.
2000); Cain v. State, 958 S.W.2d 404, 407-08 (Tex. Crim. App. 1997); Clewis
v. State, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996).  Then, the reviewing
court determines whether the evidence supporting the verdict is so weak that
the verdict is clearly wrong and manifestly unjust or whether the verdict is
against the great weight and preponderance of the conflicting evidence.  Watson,
204 S.W.3d at 414-15; Johnson, 23 S.W.3d at 10-11.

It
was undisputed at trial that appellant struck the victim, resulting in the
victim=s death, that
he left the scene in the victim=s
pickup without permission, and that he was in possession of heroin when he was
later apprehended in the victim=s
pickup by law enforcement officers.  At trial, appellant contended that he
acted in self-defense when the victim pointed a gun at his forehead.  On
appeal, appellant contends that there is no legally sufficient evidence and a
lack of factually sufficient evidence that he acted intentionally or knowingly
in causing the death of the victim as is required for the offense of murder. 
We disagree.

James
Cauble testified that he had been the victim=s
neighbor for thirteen years.  After the victim=s
wife died, Cauble and his wife checked on the victim on a daily basis.  Cauble=s wife did bookkeeping for
the victim.  The Caubles were out of town the day of the victim=s death.  When they
returned that evening, there was a phone message from the victim from 11:39
that morning.  Cauble called the victim twice.  When the victim did not answer,
Cauble went to the victim=s
house.  The lights and the TV were on, but no one came to the door.  After banging
on the door and calling out the victim=s
name, Cauble became Asuspicious@ and was concerned that the
victim had fallen and had broken his hip or hit his head.

The
victim=s garage door
was locked, and Cauble used the combination to open it.  The victim=s car was inside, but his
pickup was gone.  When Cauble walked around the back of the car, he saw an
object on the floor.  At first, Cauble thought it was an animal.  As he got
closer, he realized the object was a body.  There was so much blood Acaked@ on the victim that it took
Cauble a Afew minutes@ to identify the victim=s facial features.








Cauble
described the scene as Apretty
gruesome.@  The victim
was stretched out flat on his back with his legs straight, his left arm on his
chest, and his right arm extended.  The victim=s
face and upper torso were Apretty
well covered in blood.@ 
There was blood on the garage floor.  It did not take long for Cauble to
determine that there were no signs of life, and he left without touching
anything to call 911.

Seminole
Police Department Lieutenant Chad Hallum responded to the call.  Lieutenant
Hallum had been at the victim=s
house the week before when the victim had reported the theft of some of his
guns.  Lieutenant Hallum found nothing that indicated anyone had gone into the
house.  He concluded that the incident started and ended in the area of the
garage where the victim=s
body was.  The victim had Aquite
a bit@ of defensive
wounds on his hands and arms and gashes on his head.  The victim=s glasses were found a Afairly good@ distance from his body. 
They were bent, and there were blood spatters on the lenses.  The victim=s skull was cracked, and
Lieutenant Hallum found brain matter on a four-inch by four-inch block of
wood.  Lieutenant Hallum found a claw hammer and a shop sledgehammer on a
workbench near the body.  There were gray hairs on both hammers.  The blow on
the right side of the victim=s
head was consistent with the sledgehammer, and it appeared that the victim had
been hit in the head with the claw end of the other hammer Aseveral@ times.  The victim had an
injury to his upper ribs, and it appeared that he had been kicked.  The victim=s lips were also swollen.

The
victim had no money in his pockets, and the only money in his billfold was a
$100 bill folded up and hidden.  Seminole Police Chief Mickey Browne was able
to Ajiggle@ open the door to the
victim=s safe in the
garage.  There was $42,035 inside.  Lieutenant Hallum stated that the victim
typically carried between $300 to $1,000 on him.  Lieutenant Hallum also
testified that a long-barrel shotgun was missing from the house.

Lieutenant
Hallum testified that appellant was driving the victim=s pickup when it was recovered.  There was
blood on the hood, bumper, and Asuicide@ door behind the driver=s door.  There was blood on
the hood, and it had been Asmeared@ as though someone had
taken a towel to clean it off.  Items consistent with preparing heroin for
injection were found inside the pickup.








Chief
Browne testified that the victim had made three calls to the police department
concerning theft of property.  In the call the week before his death, the
victim reported that a 30.06 rifle and a .22 rifle with a scope were missing.

Chief
Browne stated that appellant was located at 11:00 p.m. on the night of the
offense.  Appellant was the only person in the victim=s pickup.  There was a Asignificant amount@ of blood on the outside of the pickup.  Chief
Browne stated that there were Avery
obvious signs@ that
someone had wiped down the hood and side windows.  Chief Browne saw a syringe
and a 35 millimeter film canister in the door pocket on the driver=s side of  the pickup. 
Inside the canister were twelve individual packets of black tar heroin.  Chief
Browne estimated that the heroin was worth around $500.  Appellant was wearing
new clothing.  His jeans and shoes still had the price tags on them.  Appellant
had $371 in bills and $1.07 in change in the pocket of his jeans.

Chief
Browne also observed the victim=s
garage.  He described the area that the victim was in as having a Asignificant amount of blood@ and stated that the victim
had A[t]raumatic@ wounds Aabout his head.@  Chief Browne saw trace
amounts of blood on both hammers.

Appellant
told Chief Browne that Awhat
he [had] done was totally out of character for him.@  Appellant stated that Athe old man@ pulled a gun on him and
that he had Ajust lost
it.@  Appellant said
that Athe old man was
stronger than he thought he=d
be, and he put up a pretty good fight.@ 
Appellant further stated that this was Abothering
his conscience@ and
that he wanted to Aget
if off  his chest.@ 
Appellant told Chief Browne that he went to Odessa and traded a gun, that a Afriend@ had given him, for
heroin.  Appellant refused to identify the Afriend@ or his source for the
heroin.

Thomas
Richard Beaver, an assistant professor at Texas Tech University and the
director of forensic pathology for the Health Sciences Center, testified that
Dr. Ben Bristol conducted the autopsy and that he assisted in completing the
case.  The victim had Aextensive
and numerous@ injuries
consistent with being hit with the two hammers found at the scene.  There were Apretty severe@ defensive wounds on the
victim=s hands and
arms consistent with the victim putting his hands up to protect his head and
face.  One of his fingers was broken.  There was bruising on his neck,
shoulders, chest, abdomen, and hip.  The bruises and abrasions on the victim=s lower lip indicated that
he had been struck in the mouth.  Fists and kicking could have been involved in
some of the bruising.








Dr.
Beaver testified that the cause of death was blunt force injuries to the head. 
There were Amassive@ injuries to the victim=s scalp.  His skull was
fractured, and the doctors could see into his brain through one of the
lacerations.  There was a depressed skull fracture from the sledgehammer that
drove a piece of the victim=s
skull into his brain.  Dr. Beaver described this blow as Anot compatible with life.@  A couple of the other
lacerations to the victim=s
head matched the claw end of the claw hammer.  Dr. Beaver stated that a Amultitude@ of the other injuries to
the victim=s head
resulted from blows that could have been from either of the hammers or from
other objects.

Rick
Pippins testified that he was the owner of Western Forensics, a consulting and
training business that trains in blood spatter analysis at crime scenes. 
Pippins reviewed the photographs of the crime scene, the police reports, the
crime scene sketches, and the autopsy report in this case.  Based on the large
pools of blood, Pippins concluded that the attack began and ended in the same
area.

The
Amedium velocity
impact spatter@ of
blood indicated that the victim=s
head was as close as one foot to the ground when he began to bleed.  The lack
of bloodstains on the victim=s
shoes indicated that he left his feet Avery
quickly after bloodshed occurred or immediately before@ and that he never Aregained his feet.@  The figure eight blood pattern on the garage
floor indicated that the victim had been rolled over and then rolled back. 
Inside on the lining of the victim=s
right front pants pocket were transferred bloodstains.  Pippins could identify
a minium of five blood-producing blows to the victim=s head.  A geometric stain on the garage wall
was consistent with the claw hammer becoming slippery from the victim=s blood and hitting the
wall during a swing.

 Pippins
testified concerning the difference between Aactive@ defensive wounds and Apassive@ defensive wounds.  Active
defensive wounds occur when a person instinctively puts his hands up to defend
himself from attack.  These wounds occur to the palm side of the hand.  Pippins
stated that, at Asome
point@ if a person is Ahurt enough,@ the person will stop
actively defending himself and passively cover his head or whatever body part
is threatened.  These wounds occur to the back side of the hands.  The victim=s wounds were passive
defensive wounds, and there was no indication that he had anything in his
hands.








Cecilia
V. Duran testified that appellant was her common-law husband.  In the days
before the victim=s
death, appellant had been sick because he had no heroin.  He was so sick that
she was afraid that he was dying.  A few days before the victim=s death, appellant told her
that he was ASuperman@ and that he was going to
kill with his arms.  He further told her that he had Aa plan.@ 
At 1:00 p.m. on the day of the victim=s
death, appellant left their home without saying anything.  Duran stated that in
the past appellant had stolen from her, from his family, and from a friend of
hers to support his drug habit.

Appellant
testified that he had borrowed $20 from the victim and that he had gone over to
the victim=s house to
repay the victim by working for him.  Appellant stated that he had no intent to
rob the victim when he went over to the victim=s
house.  The victim accused appellant of stealing from him.  Appellant could see
in the victim=s eyes
that he was mad.  The victim then pulled a gun and pointed it at appellant=s forehead.  The victim was
shaking, and appellant felt that the gun was going to go off.  There was
nowhere to retreat in the garage.  Appellant feared for his life and began to
back up.  He reached back, grabbed the shop sledgehammer, and swung at the
victim.  The victim still had the gun in his hand.  Appellant stated that he Aguess[ed]@ he Apanicked@
and that he was not in his Aright
mind.@  He remembered
that the victim struggled to get the gun.  He stated that he did not take money
out of the victim=s
wallet and that he did not recall using the claw hammer.

 Appellant
testified that he did not Aknowingly
or intentionally@ take
the victim=s pickup
but that it was a Aspur
of the moment@ thing. 
He was in a Apanic@ and drove off in the
victim=s pickup.  When
he left, he thought the victim was alive.  He showed the victim=s pickup to an acquaintance
in Odessa and traded some guns for drugs.  The guns were not the victim=s, and appellant stated
that he had gotten them from a friend who had Aprobably@ stolen them.  He drove
back to Seminole because he wanted to return the pickup to the victim.

On
cross-examination, appellant stated that he was twenty-six  or twenty-seven
years younger than the victim and that he outweighed the victim by forty
pounds.  Appellant maintained that he acted in self-defense, that he did not
act Aintentionally or
knowingly,@ that the
victim had a gun pointed at him, that the victim=s
trigger finger was shaking, and that the crime scene photographs were Asomething different@ from what he recalled.








We
review the factfinder=s
weighing of the evidence and cannot substitute our judgment for that of the
factfinder.  Cain, 958 S.W.2d at 407; Clewis, 922 S.W.2d at133. 
Due deference must be given to the factfinder=s
determination, particularly concerning the weight and credibility of the
evidence.  Johnson, 23 S.W.3d at 9; Jones v. State, 944 S.W.2d
642 (Tex. Crim. App. 1996).  The jury, as the finder of fact, is the sole judge
of the weight and credibility of the witnesses=
testimony.  Tex. Code Crim.
Proc. Ann. art. 36.13 (Vernon 2007), art. 38.04 (Vernon 1979).  This
court has the authority to disagree with the factfinder=s determination Aonly
when the record clearly indicates such a step is necessary to arrest the
occurrence of a manifest injustice.@ 
Johnson, 23 S.W.3d at 9.

When
viewed in the light most favorable to the verdict, the evidence is legally
sufficient to support the conviction for murder.  The jury could reasonably
have determined from the photographs and the testimony that appellant committed
the offense of murder by beating the victim to death.  Likewise, when the
evidence is viewed in a neutral light, the evidence supporting the verdict is
not so weak that the verdict is clearly wrong and manifestly unjust; and the
verdict is not against the great weight and preponderance of the conflicting
evidence.  Therefore, the evidence is also factually sufficient to support the
verdict.  The first issue is overruled.

The
trial court ordered that the punishments for appellant=s murder, unauthorized use of a motor vehicle,
and possession of heroin convictions not begin to run until appellant had been
discharged from his punishment for a prior Ector County burglary of a
habitation conviction.  Appellant contends in his second issue that the trial
court abused its discretion because it only gave him credit for the time period
between when he was paroled for the Ector County burglary and when he was
arrested for the present offenses.  Appellant requests that the court reverse
the sentence and remand to the trial court with instructions to the trial court
to give him credit from the date of his parole to the date of his parole
revocation.

Each
sentence awards appellant 510 days credit Afor
time served in jail while awaiting the trial of this case.@  The record does not
support appellant=s
claim of credit for Astreet
time.@  The second
issue is overruled.

The
judgments of the trial court are affirmed.

 

JIM R. WRIGHT

July 3, 2008                                                                             CHIEF
JUSTICE

Do not publish. 
See Tex. R. App. P. 47.2(b).

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.