**Opinion filed April 16, 2009**



In The

# Eleventh Court of Appeals

_____

## No. 11-07-00311-CR

_____

### BRADLEY TERRILL GIVENS, Appellant

### V.

### STATE OF TEXAS, Appellee

**On Appeal from the 358th District Court**

**Ector County, Texas**

**Trial Court Cause No. D-33,786**

## M E M O R A N D U M   O P I N I O N

The jury convicted Bradley Terrill Givens of aggravated sexual assault and unlawful restraint. The jury assessed his punishment for the aggravated sexual assault offense at confinement for fourteen years. The trial court assessed his punishment for the unlawful restraint offense at confinement in the county jail for one year. We affirm.

### Issues on Appeal

Appellant only challenges his aggravated sexual assault conviction. In four issues, appellant contends that the evidence is both legally and factually insufficient. Specifically, appellant argues

that he never admitted to having sexual relations with the victim, that there was no medical evidence that the victim had been sexually assaulted, that there was no evidence that he used a weapon or made any verbal threat to kill the victim, and that the medical evidence established that the victim did not suffer from any serious bodily injuries.

*Allegations and Applicable Statutory Provisions*

The indictment alleged that appellant intentionally or knowingly penetrated the victim's female sexual organ without her consent with his male sexual organ and that he compelled the victim's submission by use of physical force and violence upon the victim. TEX. PENAL CODE ANN. § 22.021(Vernon Supp. 2008) provides that the offense of sexual assault is aggravated if a person, "by acts or words," places the victim in fear of death, serious bodily injury, or kidnapping.

*Standards of Review*

In order to determine if the evidence is legally sufficient, the appellate court reviews all of the evidence in the light most favorable to the verdict and determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Jackson v. State*, 17 S.W.3d 664, 667 (Tex. Crim. App. 2000). To determine if the evidence is factually sufficient, the appellate court reviews all of the evidence in a neutral light. *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006) (overruling in part *Zuniga v. State*, 144 S.W.3d 477 (Tex. Crim. App. 2004)); *Johnson v. State*, 23 S.W.3d 1, 10-11 (Tex. Crim. App. 2000); *Cain v. State*, 958 S.W.2d 404, 407-08 (Tex. Crim. App. 1997); *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996). Then, the reviewing court determines whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Watson*, 204 S.W.3d at 414-15; *Johnson*, 23 S.W.3d at 10-11.

The appellate court reviews the factfinder's weighing of the evidence and cannot substitute its judgment for that of the factfinder. *Cain*, 958 S.W.2d at 407; *Clewis*, 922 S.W.2d at 133. Due deference must be given to the factfinder's determination, particularly concerning the weight and credibility of the evidence. *Johnson*, 23 S.W.3d 1; *Jones v. State*, 944 S.W.2d 642 (Tex. Crim. App. 1996). The jury, as the finder of fact, is the sole judge of the weight and credibility of the witnesses' testimony. TEX. CODE CRIM. PROC. ANN. art. 36.13 (Vernon 2007), art. 38.04 (Vernon 1979). This

2

court has the authority to disagree with the factfinder's determination "only when the record clearly indicates such a step is necessary to arrest the occurrence of a manifest injustice." *Johnson*, 23 S.W.3d at 9.

*Evidence at Trial*

It was undisputed at trial that appellant and the victim had lived together and had a child together. It was also undisputed that they had a stormy relationship and fought often.

The victim testified that she had dated appellant on and off for about two years and that appellant was the father of her youngest child. She stated that she had ended the relationship in February 2006 because she wanted out of the abusive relationship. She had moved out unannounced. In August, she moved to a new apartment and did not tell appellant where she was living. While appellant continued to see their child, the victim did not let appellant come to where she was living. Most of the time, they would meet at the victim's mother's home.

The victim testified that on October 30, 2006, she had been doing laundry at her mother's home. She had just returned home when appellant came over between 10:45 and 11:00 p.m. While they had been getting along at this time, appellant did not live with her and kept no clothes at her apartment. Their child was almost one year old, and they had been talking about celebrating her birthday.

Appellant came into the apartment and played with their baby. He asked the victim if he could put the baby to sleep. The victim testified that she told him he could but that he would have to leave after he did.

Appellant did not leave and followed the victim upstairs. The victim stated that appellant became angry and asked her why she was hurting their family. He began to hit her and to accuse her of having sex with other men when she would not have sex with him. He hit her on her back and on her head with his closed fist. She tried to get up, but he pulled her down to the ground. He had his hands over her nose and mouth, and she began to see black spots. The victim stated that she thought she was going to die. She described how appellant knocked the breath out of her twice and how she kicked the wall to get him off her.

She was "completely exhausted." Her lips were bleeding, and her ear was blue. Appellant told her that she was going to look "nice" for their daughter's birthday party. Every time she tried

3

to get up, appellant pushed her back down. Her ear was throbbing, and she could feel that it was swollen. Appellant held her arm down as he had sexual intercourse with her. The victim testified that she was too exhausted to fight appellant, that she was not a willing participant, and that appellant knew she was not participating willingly. She was crying "the whole time."

Around 3:30 a.m., their baby woke up. The victim told appellant that the baby was teething and wanted her bottle. Appellant gave the baby her bottle. He would not let the victim touch the baby and placed the baby on the victim's bed. If the victim said something that appellant did not like, he hit her. Neither appellant nor the victim went to sleep.

Later in the morning, appellant told her to call in sick for work. After she did, he began to apologize. Her cell phone rang several times. When she checked her phone, she had voice mails from work because she had a set of keys that her coworkers needed. She told appellant that she had to drop the keys at work. Appellant let her go but would not let her take their baby with her.

The victim testified that she went to her work and dropped off the keys. One of her coworkers saw her and could tell that "something was wrong." When he asked her what was wrong, the victim told him that appellant had beaten and raped her and that she was going to call the police from her mother's house.

The victim called the police from her mother's house and, together with a friend, went back to her apartment. Her friend went in with the police, and her mother took the baby to day care while the victim went to the hospital.

The victim repeatedly testified that appellant had not been living with her at the time and that she did not know how he knew where she was living. She stated that she had not lent appellant her car that night and that she had not called him.

Erica Powell testified that she was good friends with the victim. Powell stated that no one was living at the apartment with the victim other than her children and that appellant did not live with the victim at the time.

Christin Abbott testified that she was the sexual assault nurse examiner who interviewed and examined the victim. The victim had tenderness to her scalp and bruising to her left ear, left eye, left foot, and left side of her back from her shoulder blade down to the area where the kidney was located. She had a "real tender knot" near her belly button and bite marks on her right shoulder, left

4

back, and lower right back. Abbott found no vaginal trauma but testified that this lack of vaginal trauma was not unusual for a twenty-seven to twenty-eight-year-old woman who had had two children, was sexually active, and had been sexually assaulted. Because of the amount of tenderness the victim was experiencing, Abbott sent the victim to see a physician.

Marta Willoughby, M.D. testified that she was the emergency medical physician on duty. The nurse called her into a consultation on the victim because the victim's urine appeared bloody and because she had flank bruising that could have been "potential kidney trauma." Dr. Willoughby observed what could be an "indication of a life threatening injury" and ordered a cat scan of the victim's abdomen and pelvis as well as a urinalysis.

The cat scan revealed that appellant had bleeding within her abdominal wall muscle. While the bleeding was not in her internal organs, the bleeding was not in the superficial tissue. Dr. Willoughby could not testify as to the time frame for the abdominal injury but did testify that, when she examined the victim, she observed "active blood."

Dr. Willoughby also testified that the victim had a kidney stone. The position of the stone was "nonobstructing" and would have not normally caused the pain the victim was feeling up and down her back. Dr. Willoughby also stated that bruising behind the ear caused by a fist could cause "very serious injuries" and that the knot in the victim's abdomen was not a hernia.

Law enforcement officers who responded to the victim's call testified that she was visibly upset and had injuries to her head, her left ear, and her lip. The victim was hysterical and could not give the officers "any real detailed information." The officers entered the apartment and found appellant and the couple's baby. No furniture was overturned, and there was no evidence of a fight. They arrested appellant on an outstanding arrest warrant for simple assault.

At the hospital, the victim was still scared despite the fact that an armed police officer was present. The officers observed that the victim's lip was bleeding and that she had bite marks on her back. Semen was found as a result of the sexual assault examination. However, because appellant admitted to one of the officers that sexual intercourse had occurred between them, no DNA testing was done.

Paul "Trey" D. Adams III testified that he worked with the victim. He described how the victim came into work wearing sunglasses and clothes that she did not normally wear to work. Her

face was swollen, and she did not look like herself. She also had blood on her mouth. She walked past him before he recognized her. He followed her into the office that they shared and offered to call the police for her.

Appellant did not testify. Annie M. Norice testified that she was appellant's mother and that she knew the victim because the victim was "the female of [her] son." Norice stated that at the time in question appellant was living with the victim and their child at the victim's apartment. Norice also testified that, after appellant's arrest, the victim talked to her about going to the district attorney's office to call off the prosecution for the offense.

Norice explained that she did not recall the details of the assault complaint she had filed against appellant. In her assault complaint, she reported that appellant had assaulted her with a coffee creamer bottle and had tried to run over her with his car.

Keith Givens testified that he was appellant's brother. On the night in question, the victim had let appellant use her car. Keith met appellant at the Zodiac nightclub, but appellant had driven the victim's car there.

Keith stated that appellant got a number of calls on his cell phone. As a result, they left and went to the victim's apartment. The two men watched Sunday Night Football, and Keith passed out. When he woke up, appellant offered to let Keith spend the night. Keith refused and called for someone to pick him up.

Keith testified that he had "no idea" what teams were playing that night. He stated that, while appellant and the victim often fought, they "never [were] really separated." When they fought, appellant would stay with his mother for "a week or two."

Percy Moore, appellant's aunt, testified that appellant and the victim were living together at the time. Stacy L. Moore, appellant's cousin, also stated that appellant and the victim were "together" at the time in question.

*Analysis*

When all the evidence is viewed in the light most favorable to the verdict, we find that the evidence is sufficient to support the factfinder's determination that appellant committed the offense of aggravated sexual assault. The victim testified that she did not consent to sexual intercourse with appellant. She described how appellant hit her with his fists, pushed her down, and covered her nose

6

and mouth. She also described the injuries that resulted from his actions. The nurse who performed the sexual assault exam testified that the evidence she found matched the history of the assault that the victim had given her. Odessa Police Detective Brad Timmons testified that DNA testing was not done because it would have only confirmed what both the victim and appellant had told him – that sexual intercourse had occurred between them. The jury could have reasonably concluded, as alleged in the indictment, that appellant compelled the victim's submission by the use of physical force and violence. Not only the victim's testimony but also the testimony of the nurse, the doctor, and the police officers support the jury's determination that appellant by his words and actions placed the victim in fear of serious bodily injury or in fear for her life as required by Section 22.021. The evidence is legally sufficient.

Likewise, when the evidence is reviewed in a neutral light, we find that the evidence supporting the verdict is not so weak that the verdict is clearly wrong and manifestly unjust and that the verdict is not against the great weight and preponderance of the conflicting evidence. The jury, as the sole finder of fact, was free to believe all or none of the testimony that appellant and the victim were still living together as a couple at the time in question. Section 22.021 does not require that appellant must have actually inflicted serious bodily injury to the victim, must have used a weapon, or must have threatened to kill the victim before he could be convicted of aggravated sexual assault. There is factually sufficient evidence to support the jury's verdict that appellant placed the victim in fear of serious bodily injury or in fear for her life. Likewise, the evidence is factually sufficient to support the jury's determination that intercourse occurred between appellant and the victim without the victim's consent. All of appellant's issues are overruled.

*Holding*

The judgments of the trial court are affirmed.


PER CURIAM

April 16, 2009

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.

7