Opinion filed June 26, 2008











 
 
  
 
 







 
 
  
 
 




Opinion filed June 26,
2008

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                   __________

 

                                                          No. 11-07-00141-CR 

                                                     __________

 

                                          TRACY
LUNA, Appellant

 

                                                             V.

 

                                        STATE
OF TEXAS, Appellee

 



                                        On
Appeal from the 132nd District Court 

 

                                                          Scurry
County, Texas

 

                                                     Trial
Court Cause No. 9075

 



 

                                                                   O
P I N I O N

Tracy
Luna was indicted for capital murder.  The jury convicted her of the lesser
included offense of causing serious bodily injury to a child and assessed her
punishment at ninety-nine years confinement and a $10,000 fine.  We affirm.

I.
Background Facts








Luna
and Angel Victor Vasquez were common-law married.  They had two daughters,
four-year-old B.N.L.V. and two-year-old Natalie Vasquez.  During the early
morning hours of May 11, 2005, emergency officials were dispatched to Luna and
Vasquez=s house
because of a report that a two-year-old child was having cardiac arrest. 
Paramedics arrived and administered CPR to Natalie.  She had no electrical
activity in response to an EKG, and so she was taken to the hospital.  Because
Natalie had numerous bruises, paramedics requested that a law enforcement
officer meet them at the emergency room.  Natalie was pronounced dead at the
hospital.  The medical examiner=s
office conducted an autopsy and determined that Natalie died of complications
of blunt force trauma and neglect.

Luna
and Vasquez were indicted for capital murder.  The State alleged that they
knowingly and intentionally caused Natalie=s
death by failing to provide her with medical care or adequate food. The State
was subsequently allowed to amend the indictments to include a contention that
Luna and Vasquez had a duty to act because they were Natalie=s parents.  Luna and
Vasquez were tried together.  The jury acquitted them of capital murder but
found them guilty of the lesser included offense of intentionally or knowingly
causing serious bodily injury to a child.  The jury assessed each defendant=s punishment at ninety-nine
years confinement and a $10,000 fine.

II.
Issues on Appeal

Luna
challenges her conviction with six issues.  Luna argues that the evidence was
legally and factually insufficient, that the trial court erred by admitting
autopsy photos, that the trial court erred by including a lesser included
offense in the charge, that the trial court erred by admitting hearsay
testimony, that the trial court erred by denying her motion to sever, and that
the trial court erred by denying her motion to quash the indictment and by
granting the State=s
motion to amend the indictment.

                                                                                                                                         
III.  Analysis

A. 
Was the Evidence Legally and Factually Sufficient?

Luna
argues that the evidence is insufficient because it does not establish that she
was aware with reasonable certainty that Natalie=s
death could be prevented by taking her to the doctor.  Luna argues that the
evidence establishes that Natalie was in good health, that she was active, and
that there was no indication immediately prior to her death that she needed
medical attention.  The State responds that the evidence is sufficient because
Natalie died of malnutrition; because she had twenty-four scars, sixty-one
bruises, and an open and infected ulcer that went to the underlying bone; and
because Natalie=s need
for food and medical care was obvious.

 








1.  Standard of Review. 

To
determine if the evidence is legally sufficient, we review all of the evidence
in the light most favorable to the verdict and determine whether any rational
trier of fact could have found the essential elements of the crime beyond a
reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979); Jackson
v. State, 17 S.W.3d 664, 667 (Tex. Crim. App. 2000).  The jury was the sole
judge of the credibility of the witnesses and the weight to be given their
testimony.  Tex. Code Crim. Proc. Ann. art.
36.13 (Vernon 2007), art. 38.04 (Vernon 1979).  The jury may choose to believe
or disbelieve all or any part of any witness=s
testimony.  Sharp v. State, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986).

To
determine if the evidence is factually sufficient, the appellate court reviews
all of the evidence in a neutral light.  Watson v. State, 204 S.W.3d
404, 414 (Tex. Crim. App. 2006).  Then, the reviewing court determines whether
the evidence supporting the verdict is so weak that the verdict is clearly
wrong and manifestly unjust or whether the verdict is against the great weight
and preponderance of the conflicting evidence. Id. at 414-15.

The appellate court reviews the factfinder=s
weighing of the evidence and cannot substitute its judgment for that of the
factfinder.  Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997); Clewis
v. State,922 S.W.2d 126, 133 (Tex. Crim. App. 1996).   Due deference must
be given to the factfinder=s
determination, particularly concerning the weight and credibility of the
evidence.  Johnson v. State, 23 S.W.3d 1 (Tex. Crim. App. 2000); Jones
v. State, 944 S.W.2d 642 (Tex. Crim. App. 1996).








A
person commits an offense if she intentionally or knowingly causes injury to a
child by act or by omission if he has a duty to act. Tex. Penal Code Ann. '
22.04 (Vernon Supp. 2007).  Parents have a duty to care for, to control, to
protect, and to provide medical care to their children.  Tex. Fam. Code Ann. '
151.001(a)(2), (3) (Vernon Supp. 2007).  Injury to a child is a result of
conduct offense.  Alvarado v. State, 704 S.W.2d 36, 39 (Tex. Crim. App.
1985).  Therefore, the State must  prove not only that Luna failed to provide
adequate food and medical care but must also prove that she intentionally or
knowingly caused Natalie=s
injury.  Johnston v. State, 150 S.W.3d 630, 634 (Tex. App.CAustin 2004, no pet.).   A
person acts intentionally when it is her conscious desire to engage in the
conduct or to cause the result.  Tex.
Penal Code Ann. '
6.03(a) (Vernon 2003).  A person acts knowingly with respect to a result of her
conduct when she is aware that her conduct is reasonably certain to cause the
result.  Tex. Penal Code Ann. ' 6.03(b) (Vernon 2003). 
Serious bodily injury is injury that creates a substantial risk of death or
that causes death, serious permanent disfigurement, or protracted loss of
impairment of the function of any bodily member or organ. Tex. Penal Code Ann. ' 1.07 (a)(46) (Vernon Supp.
2007).

2.  Legal Sufficiency.[1]

Natalie
was born on December 2, 2002, and was a normal size baby.  Dr. Gustavo Gross
saw her for a two-week checkup.  She was doing well, had gained some weight
since birth, and weighed 7.7 pounds.  Dr. Gross did not see her again as a
patient until January 14, 2004.  Even though Natalie was thirteen months old,
she only weighed 13.4 pounds. Natalie appeared dehydrated, malnourished, and
hyperglycemic.  Dr. Gross made arrangements for Natalie to be hospitalized and
seen by a specialist in Lubbock.

Dr.
James V. Higgins was responsible for her treatment in Lubbock.  Dr. Higgins
testified that when Natalie arrived there were questions about her liver
function because of test results but that over two days her liver enzymes had dropped
dramatically.  Dr. Higgins testified that essentially all they did was feed
Natalie.  During the forty-eight hours she was hospitalized, Natalie took in
more food than expected, and she achieved a significant weight gain, going from
5.8 to 6.4 kilos.  This equates to a weight gain of approximately 1.3 pounds. 
Dr. Higgins described Natalie as a hungry child who wanted to eat.

Dr.
Higgins saw Natalie two weeks after her hospital discharge for a follow-up
visit.  She looked good.  Dr. Higgins recommended replacing Natalie=s milk with PediaSure to
provide more calories.  He did not recommend withholding solid food, but Luna
began telling relatives that Natalie could not handle solid food.  Later,
Natalie was only allowed to eat small amounts of solid food.








Dr.
Gross also saw Natalie shortly after her discharge.  He testified that he
stressed to Luna the need to keep any follow-up appointments with the
specialist and that he told her to take Natalie back to the doctor if she
started to lose weight.  Dr. Gross next saw Natalie on April 26, 2004.  Natalie
had the worst case of impetigo that he had ever seen.  Dr. Gross testified that
he was concerned.  He treated Natalie with an ointment and an oral antibiotic. 
He saw her for follow-up visits on April 27 and April 28.  The April 28 visit
was the last time he saw Natalie as a patient.  Dr. Gross testified that,
if he had seen a child that looked like Natalie did when she arrived at the
emergency room, he would have called the authorities.  Dr. Gross testified that
Luna and Vasquez should have been extremely concerned about Natalie=s weight, that he would
have expected them to recognize impetigo when it returned, and that he would
have expected them to seek medical treatment for it.  He also testified that
they were neglectful for not doing so.

Dr.
Thomas Lloyd Kerr saw Natalie when paramedics brought her body to the emergency
room.  He testified that, if the authorities had not already been alerted, her
injuries would have required him to do so.  She had multiple bruises on her
face, abdomen, back, hips, left leg, and behind her left ear.  These bruises
were too well-defined to have been caused by a fall.  Natalie had a decubitus
ulcer on her sacrum that went through the epidermis to the bone.  It was
infected, and it would have been painful for her.  When Dr. Gross saw Natalie
in April 2004, she weighed twenty-two pounds.  When Natalie died on May 11,
2005, her weight had dropped to seventeen pounds.

Justice
of the Peace Debra Boyd was called to the hospital.  She saw Natalie=s body and testified that a
parent should have known Natalie needed medical attention.  Sheriff Darren
Jackson was one of the law enforcement officers dispatched to the hospital, and
he too saw Natalie=s
body.  He testified that she looked six months old; that he would have realized
she needed medical attention; and that, if he had seen Natalie in this
condition, he would have taken custody of her and would have taken her to the
emergency room.  Sheriff Jackson contacted CPS and requested their assistance
because he wanted to have Luna and Vasquez=s
oldest child removed from their home.

Judge
Boyd authorized an autopsy.  Dr. Sridhar Natarajan, Chief Medical Examiner for
Lubbock County and the doctor responsible for Natalie=s autopsy, testified that there were several
indications that Natalie had not been fed properly.  These included the loss of
body fat, reduced thickness of muscle, fluid accumulating in the peritoneal
cavity, and the brittleness of her hair.  During the autopsy, doctors
identified twenty-four well-healed scars, sixty-one bruises, two previously
fractured ribs, and a staph infection in her blood.  They found little to no
fat on her chest wall and around her bowel.  The medical examiner=s office determined that
the cause of death was complications from blunt force trauma and neglect.








Even
Luna=s expert Dr.
Robert Lloyd White agreed that Natalie was malnourished, that she died from
protein-calorie malnutrition, and that she had extensive bruises of a
suspicious nature.  He would have included battered baby syndrome as a
contributing condition and homicide as the manner of death if he had done the
autopsy.  He believed that Natalie needed medical attention.

Relatives
had noticed Natalie=s
bruises and weight loss.  When they asked about Natalie=s bruises, Luna always had an explanation,
such as falls.  When Natalie had marks on her face that appeared to be burns,
Luna said that they were caused by chemicals on a watermelon that had not been
properly washed.  She lied to her brother about taking Natalie to the doctor. 
Luna=s mother thought
Natalie was sick because she was so small, and she told Luna to take Natalie to
the doctor.  Luna=s
father told her to let Natalie eat.  Luna got mad at him for feeding Natalie,
and on one occasion, Luna and Vasquez left his house because they thought he
had given Natalie too much food.

Luna
testified in her own defense.  When Natalie first developed impetigo sores she
took her to the doctor.  The sores cleared up with medication.  She treated the
ulcer on Natalie=s
tailbone with a cream from Wal-Mart.  Natalie started to pick at it, and Luna
began using Neosporin and Benadryl. Luna understood the seriousness of
impetigo.  She knew what it was when it returned but decided not to take
Natalie to the doctor.  Luna was aware that Natalie had lost weight.  She and
Vasquez talked about it.  Luna attributed Natalie=s
bruises to falling and playing.  However, when shown the pictures from the
emergency room, Luna testified that she had never seen several of the bruises
visible on her body.

Kerrie
Blair, a CPS investigator, went to Luna and Vasquez=s residence.  She asked to see the cream Luna
told law enforcement officials she had been using to treat Natalie=s ulcer.  Luna told her
that it had been thrown away and was unable to produce any medication.  Luna
claimed that she had also been using Neosporin to treat Natalie=s ulcer but told Blair that
they had been out of it for a couple of days.  Luna agreed that she did not
have any of the cream she had previously received from Dr. Gross but claimed
that Blair was lying when she said that there was no Neosporin in the house.

Blair
testified that PediaSure was available free of charge from the WIC program. 
She testified that she learned during her investigation that Luna had gotten
into a disagreement with the WIC nurse and that she stopped going to the WIC
office.  Blair testified that she learned Natalie was not allowed to get food
when she wanted and that, if she attempted to do so, she was punished.  Luna
and Vasquez=s two
dogs, however, appeared well-fed.








The
evidence is legally sufficient.  Luna argues that there was no evidence that
she was aware with reasonable certainty that Natalie=s death would have been prevented by taking
her to the doctor. This is not the specific question we must address because
Luna was not convicted of capital murder.  The question is whether Luna
intentionally or knowingly caused Natalie serious bodily injury by failing to
provide adequate food or medical care. Natalie died of malnutrition and had a
number of other health-related issues.  Luna knew that Natalie had lost weight,
knew the importance of watching her weight and the need to see a doctor if she
lost weight, knew the seriousness of impetigo and that Natalie=s impetigo had returned,
and knew that Natalie had an open ulcer with exposed bone.   Luna had been
encouraged by relatives to feed Natalie more or to take her to a doctor.  The
number of bruises and scars on Natalie=s
body would have caused any healthcare provider concern and may explain why she
did not take Natalie to the doctor and why she lied to relatives about doing
so.  Luna was not prevented from taking Natalie to the doctor, acquiring
medication for her ulcer or impetigo, or feeding her.  Each of these was the
result of a conscious decision with knowledge that Natalie=s health was being risked. 
Furthermore, there was testimony from impartial witnesses that Natalie=s appearance alone
indicated the need for medical attention B
testimony definitively corroborated by the emergency room photographs. 

3.  Factual Sufficiency. 

Luna
argues alternatively that, if the evidence is legally sufficient, it is
factually insufficient.  Luna points to testimony from relatives that they
never saw her strike Natalie or thought she needed to see a doctor, and she
points to conflicting testimony between Dr. Natarajan and Dr. White. 
Dr. White was critical of Dr. Natarajan=s
use of the word Aneglect@ as a cause of death
because it is not a proper medical term.  Dr. White agreed that Natalie died as
a result of malnutrition but did not believe that she had been intentionally
starved because she had food in her stomach and intestines at the time of her
death.  He agreed that Natalie had extensive bruises of a suspicious nature but
noted that she had no internal injuries.  Dr. White testified that Natalie
could have suffered from a disease that prevented her from properly absorbing
nutrients, was critical of Natalie=s
follow-up care after being released from the Lubbock hospital, and opined that
she had an underlying metabolic genetic abnormality.  Dr. Higgins disagreed with
this last opinion.  He testified that Natalie did not have a chronic metabolic
disease.








The
jury was authorized to resolve any conflicts between Dr. Natarajan, Dr.
Higgins, and Dr. White=s
testimony.  Consequently, the mere fact that there was some disagreement
between two doctors does not make the evidence factually insufficient. 
Moreover, we note that Dr. White=s
testimony was not completely exculpatory.  He agreed with much of the autopsy
report.  He testified that the extent of Natalie=s
bruising was suspicious, he had concerns over the fact that she was not taken
to the doctor, and he testified that her ulcer needed medical attention.

Luna
understandably focuses on differences in the doctors= testimony regarding how and why Natalie
died.  Our review, however, concerns the jury=s
finding of injury to a child.  Even if Dr. White was correct that Natalie=s malnutrition was caused
by a genetic disorder rather than lack of food, this would have manifested
itself by physical symptoms such as weight loss.[2] 
Luna was aware that Natalie had been losing weight and had been told to take
her back to the doctor if this occurred.  Luna did not do so.  The jury could
have considered Dr. White=s
testimony and still concluded that Luna knowingly or intentionally caused
Natalie serious bodily injury by failing to provide adequate food or medical
care.  Dr. White=s
testimony, therefore, does not make the evidence factually insufficient.  Issue
one is overruled.  

B. 
Did the Trial Court Err by Admitting Autopsy Photographs? 

The
State offered a number of photographs from Natalie=s autopsy.  Some of these photographs were
taken after invasive procedures had started, and they revealed Natalie=s chest cavity, internal
organs, and skull.  Luna objected contending that the photographs were unfairly
prejudicial because of their graphic nature.  The trial court overruled that
objection.  The trial court found that words alone could not fully illustrate
that which the photographs portrayed and that the number of photographs had
been reduced to a small number showing different injuries.  The trial court
concluded that the prejudicial effect of the photographs did not outweigh their
probative value.








We
review the trial court=s
decision to admit photographs for an abuse of discretion.  Paredes v.
State, 129 S.W.3d 530, 539 (Tex. Crim. App. 2004).  There is no abuse of
discretion when the trial court=s
ruling lies within the zone of reasonable disagreement.  Moses v. State,
105 S.W.3d 622, 627 (Tex. Crim. App. 2003).  A photograph is generally
admissible if verbal testimony about the matters depicted in the photograph is
also admissible.  Paredes, 129 S.W.3d at 539.  A trial court does not
err merely because it admits into evidence photographs which are gruesome.  Id.
at 540.   However, even though relevant, photographs may still be inadmissible
if their probative value is outweighed by the danger of unfair prejudice.  Tex. R. Evid. 403.  This requires
consideration of the number of photographs offered, their detail and size,
whether they are black and white or color, whether they are close up, the
availability of other means of proof, and the circumstances unique to each
individual case.  Sonnier v. State, 913 S.W.2d 511, 518 (Tex. Crim. App.
1995).  

Dr.
Natarajan testified that he selected twenty-four to twenty-five autopsy
photographs to depict Natalie=s
injuries, that he tried to avoid repetition, and that it was difficult to
visualize her injuries without the photographs.  His testimony incorporated the
photographs.  For example, he testified about the lack of body fat on Natalie=s chest wall and around her
bowel and the appearance of that body fat.  He referred to the photos to help
illustrate this testimony.  

We
have independently examined the photographs.  They are in color, are not
inordinately large, appear to have been taken by someone standing next to the
autopsy table, and depict what someone participating in the autopsy would have
observed.  Some of the photographs are graphic in nature, and some show the
results of the autopsy itself.  Because this case arises out of the death of a
small child, they necessarily have an emotional impact.  We cannot, however,
conclude that the trial court abused its discretion.  The trial court=s findings that the photos
were reasonable in number, that they illustrated matters impossible to describe
with words alone, and that their probative value was not outweighed by their
prejudicial effect are supported by the record.  Issue two is overruled.

C. 
Did the Trial Court Err by Denying Luna=s
Objection to the Charge? 

Luna
objected to the charge because it contained different levels of offenses of
causing bodily injury to a child and requested that it instead include only
the lesser included offenses of manslaughter and criminally negligent homicide. 
Luna reasons that the jury believed that she did not intend for Natalie to die
and that the only reasonable conclusion a juror could have drawn was that she
acted recklessly or with criminal negligence.  Luna argues that she was harmed
because the court=s
charge effectively gave the jury a second way to convict her of murder and a
way to impose a substantial punishment without finding that she intentionally
killed Natalie.








When
we review a trial court=s
decision to include or exclude a lesser included offense, we consider the
charged offense, the statutory elements of the lesser offense, and the evidence
actually presented at trial.  Hayward v. State, 158 S.W.3d 476, 478
(Tex. Crim. App. 2005).  We then employ a two-part test.  First, the lesser
included offense must be included with the proof necessary to establish the
offense charged.  Rousseau v. State, 855 S.W.2d 666, 672-73 (Tex. Crim.
App. 1993).  Second, some evidence must exist in the record that, if the
defendant is guilty, she is guilty only of the lesser offense.  Id.  

Manslaughter
and criminally negligent homicide are both lesser included offenses of capital
murder.  Cardenas v. State, 30 S.W.3d 384, 392-93 (Tex. Crim. App.
2000).  However, injury to a child is also a lesser included offense. Paz v.
State, 44 S.W.3d 98, 101 (Tex. App.CHouston
[14th Dist.] 2001, pet. dism=d). 
We have previously held that the evidence is legally and factually sufficient
to support Luna=s
conviction.  The trial court, therefore, did not err by including injury to a
child in the charge.   Cf. Chase v. State, 968 S.W.2d 943, 946 (Tex.
App.CEastland 1998,
pet. ref=d) (if
evidence from any source raises the issue of a lesser included offense, a
requested charge on that offense must be included).  Issue three is overruled. 


D. 
Did the Trial Court Erroneously Admit Hearsay Evidence?  

Luna
complains that the trial court erroneously allowed Leann Hicks, a licensed
professional counselor, to testify about statements B.N.L.V. made to her during
the course of counseling sessions, contending this was inadmissible hearsay. 
Hicks testified that B.N.L.V. was referred to her by CPS for grief counseling. 
Hicks testified that B.N.L.V.=s
statements to her were part of the counseling process, that the statements were
made for the purpose of receiving medical treatment, that she stressed to
B.N.L.V. the need to be truthful, and that she confirmed B.N.L.V.=s understanding of the
difference between the truth and a lie.








Hicks
testified that B.N.L.V. was four years old when their counseling sessions
started.  The first session occurred at B.N.L.V.=s
house with her family present.  Hicks began meeting with B.N.L.V. individually
when she was placed with a foster family.  During one of the individual
sessions, B.N.L.V. said, AI
wish we hadn=t of been
so mean to my baby sister, Natalie.@ 
She told Hicks that she had accidently hit Natalie with a rope.  She also told
Hicks that Natalie had been bad, that Natalie had gotten a cookie and a banana
without permission, and that Natalie was picking her nose.  According to
B.N.L.V., Natalie got into trouble for getting food several times and was
spanked by her mother for doing so.

Hicks
testified that B.N.L.V. began to exhibit symptoms of post-traumatic stress
disorder. B.N.L.V. started wetting herself and was having nightmares.  Those
nightmares began to incorporate her father.  B.N.L.V. said that, when her
father got mad, he hit Natalie in the face, back, and legs.  She told Hicks
that Natalie was kicked and thrown in the corner and that her father grabbed
Natalie by the hair.  Hicks witnessed B.N.L.V. have a flashback.  B.N.L.V.
illustrated with a doll her father stepping on Natalie, kicking her into a
corner, and grabbing her hair.  According to Hicks, B.N.L.V. was afraid of both
her parents.  She expressed a fear that they would hurt her too and that she
would die like her sister. 

B.N.L.V.=s statements to Hicks are
hearsay, but the State argues that they fall within the medical diagnosis or
treatment exception.  Tex. R. Evid.
803(4).  The crucial issue under Rule 803(4) is whether the out-of-court
statement was reasonably pertinent to medical diagnosis or treatment.  Gregory
v. State, 56 S.W.3d 164, 183 (Tex. App.CHouston
[14th Dist.] 2001, pet. dism=d). 
Texas courts have allowed non-physicians to testify under this exception.  See,
e.g., Taylor v. State, No. 01-05-01183-CR, 2007 WL 2214859 (Tex. App.CHouston [1st Dist.] Aug. 2,
2007, pet. granted) (licensed professional counselor); Horner v. State,
129 S.W.3d 210, 219 (Tex. App.CCorpus
Christi 2004, pet. ref=d)
(medical social worker); Wilder v. State, 111 S.W.3d 249, 256 (Tex. App.CTexarkana 2003, pet. ref=d) (licensed professional
counselor); Puderbaugh v. State, 31 S.W.3d 683, 685 (Tex. App.CBeaumont 2000, pet. ref=d) (clinical social
worker); Gohring v. State, 967 S.W.2d 459, 461 (Tex. App.CBeaumont 1998, no pet.)
(play therapist working under the supervision of a licensed psychologist); Moyer
v. State, 948 S.W.2d 525, 527-28 (Tex. App.CFort
Worth 1997, pet. ref=d)
(paramedic); Torres v. State, 807 S.W.2d 884, 886-87 (Tex. App.CCorpus Christ 1991, pet.
ref=d) (emergency room
nurse);  Macias v. State, 776 S.W.2d 255, 258-59 (Tex. App.CSan Antonio 1989, pet. ref=d) (psychologist).








The
trial court did not abuse its discretion by finding that Hicks=s testimony was
admissible.  Hicks had seventeen years experience as a counselor.  She
testified that she utilized B.N.L.V.=s
statements to diagnose and treat B.N.L.V. and that this is the type of
information upon which counselors normally rely.  This is sufficient evidence
to support the trial court=s
exercise of discretion.  Issue four is overruled.

E. 
Did the Trial Court Err by Denying the Motion to Sever? 

If
Hicks=s testimony was
admissible, Luna argues that the trial court erred by denying her motion to
sever because B.N.L.V.=s
statements regarding her father=s
actions were so prejudicial that it resulted in an improper verdict.  The trial
court has the discretion to try two defendants together when they are indicted
for the same offense or any offense growing out of the same transaction.  Tex. Code Crim. Proc. Ann. art 36.09
(Vernon 2007).  This statute also gives the trial court the discretion to sever
the defendants upon evidence that one has a previous admissible conviction or a
joint trial would prejudice the moving defendant.  Qualley v. State, 206
S.W.3d 624, 631 (Tex. Crim. App. 2006).  

Article
36.09=s legislative
history indicates that the legislature intended two defendants accused of the
same offense to ordinarily be tried together. Id. at 632.  The prejudice
required to support a severance, therefore, must be more than the circumstances
or disagreements between parties that would normally be expected to arise
during any trial containing multiple defendants.  Id.  The previous
admissible conviction ground is applicable only if the conviction is admitted
at trial.  Rivello v. State, 476 S.W.2d 299, 300 (Tex. Crim. App.
1971).  

The
State argues initially that Luna=s
point is not properly before us because her motion for severance was predicated
upon the prejudicial impact of evidence that Vasquez sexually assaulted their
children.  The State did not offer that evidence.  The State points us to
language in the Qualley decision that a new ground for severance is in
essence a new motion and must be raised timely.  206 S.W.3d at 638.  We agree
with the State.  Because Luna=s
motion for severance is predicated upon different grounds than those advanced
on appeal, Luna has not preserved this issue.








We
note further, however, that the record does not establish an abuse of
discretion by the trial court.  Evidence implicating one defendant to a greater
degree than the other is the type of evidence one would frequently expect to
encounter in a trial involving multiple defendants.  Qualley is clear
that more is required to establish the requisite prejudice.  206 S.W.3d at
632.  Moreover, Hicks=s
testimony implicated both defendants.  Luna correctly notes that some of the
most compelling testimony was B.N.L.V.=s
statements describing her father=s
abusive behavior.  However, Hicks also related B.N.L.V.=s statements that she was afraid of both
parents, that they were mean to Natalie because she was bad, that Luna spanked
Natalie for getting food, and that she was afraid they would hurt her too. 
Finally, B.N.L.V. told Hicks that both Luna and Vasquez had warned her not to
talk to the counselor or to her foster parents.  Issue five is overruled.

F. 
Did the Trial Court Err by Refusing to Quash the Indictment and by Allowing the
State to Amend It?  

Luna
was originally indicted for failing to provide medical care or adequate food to
Natalie.  Prior to trial Luna filed a motion to quash, correctly pointing out
that the indictment did not allege an offense because it did not allege that
Luna had a duty to provide Natalie with food or medical care.  The State
responded with a motion to amend the indictment by adding an allegation that
Luna had a duty to act because she was Natalie=s
parent.  The trial court granted the State=s
motion to amend. 

Luna
argues that this was error because an indictment may not be amended over the
defendant=s objection
if the amended indictment charges the defendant with an additional or different
offense, or if the defendant=s
substantial rights are prejudiced.  Tex.
Code Crim. Proc. Ann. art. 28.10(c) (Vernon 2006).  We disagree.  The
original indictment charged Luna with capital murder by failing to provide
medical care or adequate food to a child younger than six years of age.  Tex. Penal Code Ann. ' 19.03(8) (Vernon Supp.
2007).  The amended indictment alleged the same offense but merely added a
missing element.  This does not violate Article 28.10(c).  Flowers v. State,
815 S.W.2d 724, 728-29 (Tex. Crim. App. 1991).  Issue six is overruled.  

IV. 
Holding

The
judgment of the trial court is affirmed.

 

 

RICK STRANGE

JUSTICE

June 26, 2008

Publish.  See
Tex. R. App. P. 47.2(b).

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.









[1]Luna challenges the admission of a counselor=s testimony by separate issue.  We are required to
consider a legal sufficiency challenge before a challenge to the admission of
evidence.  To simplify our review, we are not considering the challenged
evidence in our legal or factual sufficiency analysis.  





[2]Dr. Gross testified that metabolic disease manifests
itself in growth failure, failure to thrive, and weight loss. It can also
manifest itself with seizures, skin rashes, abnormal pigmentation, excessive
hair growth, lumps and bruises, enlarged lymph nodes, excessive urination,
renal failure, and dehydration.