**Opinion filed October 29, 2009**



In The

# Eleventh Court of Appeals

_____

## No. 11-08-00009-CR

_____

## JOSHUA DAVID CALLEN, Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 104th District Court**

**Taylor County, Texas**

**Trial Court Cause No. 16110B**

## O P I N I O N

The jury convicted Joshua David Callen of murder and assessed his punishment at thirty years confinement. We affirm.

In his third issue on appeal, appellant argues that the evidence is legally and factually insufficient to support his conviction. To determine if the evidence is legally sufficient, we must review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979); *Jackson v. State*, 17 S.W.3d 664 (Tex. Crim. App. 2000).

To determine if the evidence is factually sufficient, we must review all of the evidence in a neutral light and determine whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006); *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996). We review the factfinder's weighing of the evidence and cannot substitute our judgment for that of the factfinder. *Cain*, 958 S.W.2d 404, 407-08 (Tex. Crim. App. 1997); *Clewis*, 922 S.W.2d at 135. Due deference must be given to the jury's determination, particularly concerning the weight and credibility of the evidence. *Johnson v. State*, 23 S.W.3d 1 (Tex. Crim. App. 2000); *Jones v. State*, 944 S.W.2d 642 (Tex. Crim. App. 1996). This court has the authority to disagree with the factfinder's determination "only when the record clearly indicates such a step is necessary to arrest the occurrence of a manifest injustice." *Johnson v. State*, 23 S.W.3d at 9.

Appellant was indicted for the murder of his six-week-old infant daughter, B.C. The record shows that appellant and Cathalean Wright were the parents of twin daughters, B.C. and K.C., born February 6, 2006. Prior to the birth of the twins, appellant and Wright were living on the streets. With the help of a local church, appellant and Wright were able to move into an apartment. After the birth of the twins, appellant and Wright received services from numerous agencies.

Wright has limited cognitive ability and was unable to care for the twins. There was testimony at trial that Wright had no maternal instincts and did not bond with the twins. Child Protective Services received a referral for the twins before they left the hospital based upon concerns of neglect. Testimony at trial established that appellant had the greater ability to care for the twins and was the primary caretaker. CPS developed a child safety plan stating that the twins were not to be left alone with Wright.

On March 20, 2006, appellant left the twins at home alone with Wright. Wright became "very frantic, very panicked" when the babies' apnea monitors went off, and she called CPS. A CPS caseworker stayed in the home until appellant returned. CPS sought an emergency order to remove the twins from the home on that day, but the request was denied. The record shows that appellant became frustrated and called Randy Halstead, a church member who was helping appellant and Wright. Halstead came over and cared for the twins for about thirty minutes to give appellant a

2

break.  On the morning of March 21, Cara Flanders, another church member, went to appellant's apartment to take K.C. for a doctor's appointment.  When Flanders arrived, no one at the apartment was awake.  Appellant asked Flanders to come in and help dress the baby.  Flanders noticed that B.C. did not appear well and that "her color didn't look right."  Flanders took B.C. to the hospital.  B.C. died on March 24, 2006.  B.C. had two impacts to her head, one resulting in a skull fracture.  The medical examiner testified that B.C. died from blunt force trauma to the head.

Officer Thomas Valdez, formerly with the Abilene Police Department, testified that he went to the hospital on March 23, 2006, after receiving a call concerning an infant with a severe head injury.  Officer Valdez spoke with both appellant and Wright at the hospital.  Appellant told Officer Valdez that they took B.C. to the hospital because she was having trouble breathing.

Officer Valdez spoke with appellant again on March 24, 2006, and appellant gave a written statement.  In that statement, appellant said that Wright would yell at B.C. and tell her to "shut the f--k up."  Appellant said that, on March 20, he fed the twins and put them to bed.  Around midnight, B.C.'s apnea monitor went off, and appellant reset the button and picked her up.  Appellant put B.C. back in her crib after she seemed to catch her breath.  At 4:00 a.m., B.C. began to cry and woke appellant.  Appellant held B.C., gave her a bottle, and put her back to bed.  At 8:30 a.m., appellant woke up when Flanders knocked on the door to take K.C. to the doctor.  When appellant got B.C. out of her crib, he noticed she was pale and having difficulty breathing.  Flanders took them to the emergency room.  Appellant said that Wright had spanked B.C.  In the March 24 statement, appellant denied causing B.C.'s head injury and stated that he did not know if Wright "did anything to [B.C.]."

Officer Valdez next spoke to appellant on April 3, 2006, and appellant gave another written statement.  The jury heard the following statement:

> Tuesday morning at 7:15 or 7:20 a.m., [B.C.'s] monitor went off for a high or low heart rate.  I turned off her monitor and picked up [B.C.] in my right arm. [Wright] was screaming at me and [B.C.].  [B.C.] was crying. [Wright] was poking me in the back and telling me "Make [B.C.] shut the f--k up."  After at least 10 to 30 minutes of this I backhanded [Wright], and 15 minutes later I moved [B.C.] to my left arm and hit her head a little harder than I should have on her forehead, then slammed her harder than I should have in her crib, but I never see her hit the top of her head on the crib, just the very back of her head on the bed.

3

Marla Wawee, a friend of appellant's, testified that she had a conversation with Wright in which Wright admitted that she had thrown B.C. in the crib causing the head injury. Wright also told Wawee that she wanted appellant to go to prison for the way he was treating her. On cross-examination, Wawee admitted that appellant had asked her to try and get evidence from Wright.

Appellant presented evidence at trial that Wright was responsible for injuring B.C. The evidence established that Wright had limited cognitive ability and was unable to care for the twins. However, there was testimony that CPS's concerns regarding Wright were centered on neglect, not abuse. There was also testimony that neither appellant nor Wright "bonded" with the babies. Appellant "did what he had to do to take care of them . . . it wasn't fatherly or motherly on either side." There was evidence of another violent act where police were called to the apartment because appellant broke a lamp when Wright would not turn it off. The evidence showed that appellant was frustrated over caring for Wright and the twins. Appellant gave a voluntary, written statement in which he admitted hitting B.C. in the head. The jury, as the trier of fact, was the sole judge of the credibility of the witnesses and of the weight to be given to their testimony. TEX. CODE CRIM. PROC. ANN. art. 36.13 (Vernon 2007), art. 38.04 (Vernon 1979). As such, the jury was free to believe or disbelieve all or any part of any witness's testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). We find that the evidence is legally and factually sufficient to support the conviction. Appellant's third issue on appeal is overruled.

In his first and second issues on appeal, appellant makes complaints regarding juror separation after deliberations had begun. After the jury found appellant guilty, it began to deliberate upon his punishment. While they were deliberating, appellant discovered that, during the lunch break, the bailiff allowed one of the jurors to separate from the other jurors so that that juror could smoke his pipe. Appellant also discovered that, during guilt/innocence deliberations, the trial court had allowed that same juror to separate from the rest of the jurors for the same reason. Appellant moved for a mistrial at that time, but the trial court took the motion under advisement and allowed the jury to continue its deliberations.

After the jury completed its deliberations, the trial court heard testimony on appellant's motion for mistrial. Steve Smith, the bailiff, testified that, during the guilt/innocence phase of trial, a juror asked to be allowed to smoke. The trial court allowed the juror to smoke; Smith remained

4

with the other jurors. The following day during deliberations in the punishment phase, the juror again asked to be allowed to smoke. Without consulting the trial court, Smith allowed the juror to smoke. The trial court was unaware of the juror's subsequent request for a smoke break during the punishment phase.

Smith further testified that in each instance, when the juror was allowed to separate, the other jurors were in the break room for lunch and were not conducting deliberations. Smith said that the trial court instructed the jurors not to deliberate during the lunch break. Smith remained with the other eleven jurors; they did not discuss the case in the juror's absence. The juror in question also testified that he did not talk to anyone while separated from the other jurors and that he did not discuss the case with anyone.

TEX. CODE CRIM. PROC. ANN. art. 35.23 (Vernon 2006) provides in relevant part:

> When jurors have been sworn in a felony case, the court may, at its discretion, permit the jurors to separate until the court has given its charge to the jury. The court on its own motion may and on the motion of either party shall, after having given its charge to the jury, order that the jury not be allowed to separate, after which the jury shall be kept together, and not permitted to separate except to the extent of housing female jurors separate and apart from male jurors, until a verdict has been rendered or the jury finally discharged. . . . In any case in which the jury is permitted to separate, the court shall first give the jurors proper instructions with regard to their conduct as jurors when so separated.

Prior to the change in Article 35.23, jurors were not allowed to separate after the charge had been read to them, unless the parties agreed to the separation. Now, Article 35.23 no longer prohibits separation of the jury after the charge has been read. *Sanchez v. State*, 906 S.W.2d 176, 178 (Tex. App.—Fort Worth 1995, pet. ref'd & pet. dism'd). The court may, in its discretion, or shall, at the request of a party, sequester the jury. *Sanchez*, 906 S.W.2d at 178. A party waives the right to have the jury sequestered unless the party makes a timely request to sequester the jury. *Keiser v. State*, 880 S.W.2d 222, 223 (Tex. App.—Austin 1994, pet. ref'd). A timely request is one that is made either before jury deliberations begin or before the jury is allowed to separate. *Keiser*, 880 S.W.2d at 223. If there is no such request, it is within the trial court's discretion to allow the jury to separate.

Appellant argues that he was not allowed the opportunity to move to sequester or to object to the separation. To the contrary, appellant could have moved to sequester at any time before the jury separated. However, appellant did not at any time before the jury separated request that the jury be sequestered. Therefore, he waived his right to have the jury sequestered. The trial court did not err when it overruled the motion for mistrial.[1] Appellant's first and second issues on appeal are overruled.

The judgment of the trial court is affirmed.

JIM R. WRIGHT
CHIEF JUSTICE

October 29, 2009

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.

---

[1]No complaint is made that the trial court abused its discretion in deciding to allow the jury to separate.