Opinion filed October 29, 2009











 
 
  
 
 







 
 
  
 
 




Opinion filed October 29,
2009

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                  ___________

 

                                                          No. 11-08-00009-CR 

              __________

 

                                JOSHUA DAVID CALLEN, Appellant

 

                                                             V.

 

                                        STATE
OF TEXAS, Appellee

 



 

                                         On
Appeal from the 104th District Court

 

                                                          Taylor
County, Texas

 

                                                  Trial
Court Cause No. 16110B

 



 

                                                                   O
P I N I O N

 

The
jury convicted Joshua David Callen of murder and assessed his punishment at
thirty years confinement.  We affirm.  








In
his third issue on appeal, appellant argues that the evidence is legally and
factually insufficient to support his conviction.  To determine if the evidence
is legally sufficient, we must review all of the evidence in the light most
favorable to the verdict and determine whether any rational trier of fact could
have found the essential elements of the crime beyond a reasonable doubt.   Jackson
v. Virginia, 443 U.S. 307 (1979); Jackson v. State, 17 S.W.3d 664
(Tex. Crim. App. 2000).  To determine if the evidence is factually sufficient,
we must review all of the evidence in a neutral light and determine whether the
evidence supporting the verdict is so weak that the verdict is clearly wrong
and manifestly unjust or whether the verdict is against the great weight and
preponderance of the conflicting evidence.  Watson v. State, 204 S.W.3d
404, 414‑15 (Tex. Crim. App. 2006); Clewis v. State, 922 S.W.2d
126, 129 (Tex. Crim. App. 1996).  We review the factfinder=s weighing of the evidence
and cannot substitute our judgment for that of the factfinder.  Cain,
958 S.W.2d 404, 407-08 (Tex. Crim. App. 1997); Clewis, 922 S.W.2d
at 135.  Due deference must be given to the jury=s
determination, particularly concerning the weight and credibility of the
evidence.  Johnson v. State, 23 S.W.3d 1 (Tex. Crim. App. 2000); Jones
v. State, 944 S.W.2d 642 (Tex. Crim. App. 1996).  This court has the
authority to disagree with the factfinder=s
determination Aonly
when the record clearly indicates such a step is necessary to arrest the
occurrence of a manifest injustice.@ 
Johnson v.  State, 23 S.W.3d at 9.

Appellant
was indicted for the murder of his six-week-old infant daughter, B.C.  The
record shows that appellant and Cathalean Wright were the parents of twin
daughters, B.C. and K.C., born February 6, 2006.  Prior to the birth of the
twins, appellant and Wright were living on the streets.  With the help of a
local church, appellant and Wright were able to move into an apartment.  After
the birth of the twins, appellant and Wright received services from numerous
agencies.

Wright
has limited cognitive ability and was unable to care for the twins.  There was
testimony at trial that Wright had no maternal instincts and did not bond with
the twins.  Child Protective Services received a referral for the twins before
they left the hospital based upon  concerns of neglect.  Testimony at trial
established that appellant had the greater ability to care for the twins and
was the primary caretaker.  CPS developed a child safety plan stating that the
twins were not to be left alone with Wright.  








On
March 20, 2006, appellant left the twins at home alone with Wright.  Wright 
became Avery frantic,
very panicked@ when
the babies= apnea
monitors went off, and she called CPS.  A CPS caseworker stayed in the home
until appellant returned.  CPS sought an emergency order to remove the twins
from the home on that day, but the request was denied.  The record shows that
appellant became frustrated and called Randy Halstead, a church member who was
helping appellant and Wright.  Halstead came over and cared for the twins for
about thirty minutes to give appellant a break.  On the morning of March 21,
Cara Flanders, another church member, went to appellant=s apartment to take K.C. for a doctor=s appointment.  When
Flanders arrived, no one at the apartment was awake.  Appellant asked Flanders
to come in and help dress the baby.  Flanders noticed that B.C. did not appear
well and that Aher
color didn=t look
right.@  Flanders took
B.C. to the hospital.  B.C. died on March 24, 2006.  B.C. had two impacts to
her head, one resulting in a skull fracture.  The medical examiner testified
that B.C. died from blunt force trauma to the head.

Officer
Thomas Valdez, formerly with the Abilene Police Department, testified that he
went to the hospital on March 23, 2006, after receiving a call concerning an
infant with a severe head injury.  Officer Valdez spoke with both appellant and
Wright at the hospital.  Appellant told Officer Valdez that they took B.C. to
the hospital because she was having trouble breathing.

Officer
Valdez spoke with appellant again on March 24, 2006, and appellant gave a
written statement.  In that statement, appellant said that Wright would yell at
B.C. and tell her to Ashut
the f--k up.@ 
Appellant said that, on March 20, he fed the twins and put them to bed.  Around
midnight, B.C.=s apnea
monitor went off, and appellant reset the button and picked her up.  Appellant
put B.C. back in her crib after she seemed to catch her breath.  At 4:00 a.m.,
B.C. began to cry and woke appellant.  Appellant held B.C., gave her a bottle,
and put her back to bed.  At 8:30 a.m., appellant woke up when Flanders knocked
on the door to take K.C. to the doctor.  When appellant got B.C. out of her
crib, he noticed she was pale and having difficulty breathing.  Flanders took
them to the emergency room.  Appellant said that Wright had spanked B.C.  In
the March 24 statement, appellant denied causing B.C.=s head injury and stated that he did not know
if Wright Adid
anything to [B.C.].@

Officer
Valdez next spoke to appellant on April 3, 2006, and appellant gave another
written statement.  The jury heard the following statement:

Tuesday
morning at 7:15 or 7:20 a.m., [B.C.=s]
monitor went off for a high or low heart rate.  I turned off her monitor and
picked up [B.C.] in my right arm. [Wright] was screaming at me and [B.C.]. 
[B.C.] was crying. [Wright] was poking me in the back and telling me AMake [B.C.] shut the f--k
up.@  After at least
10 to 30 minutes of this I backhanded [Wright], and 15 minutes later I moved
[B.C.] to my left arm and hit her head a little harder than I should have on
her forehead, then slammed her harder than I should have in her crib, but I
never see her hit the top of her head on the crib, just the very back of her
head on the bed.

 








Marla
Wawee, a friend of appellant=s,
testified that she had a conversation with Wright in which Wright admitted that
she had thrown B.C. in the crib causing the head injury.  Wright also told
Wawee that she wanted appellant to go to prison for the way he was treating
her.  On cross-examination, Wawee admitted that appellant had asked her to try
and get evidence from Wright.

Appellant
presented evidence at trial that Wright was responsible for injuring B.C.  The
evidence established that Wright had limited cognitive ability and was unable
to care for the twins.  However, there was testimony that CPS=s concerns regarding Wright
were centered on neglect, not abuse.  There was also testimony that neither
appellant nor Wright Abonded@ with the babies. 
Appellant Adid what he
had to do to take care of them . . . it wasn=t
fatherly or motherly on either side.@ 
There was evidence of another violent act where police were called to the
apartment because appellant broke a lamp when Wright would not turn it off. 
The evidence showed that appellant was frustrated over caring for Wright and
the twins.  Appellant gave a voluntary, written statement in which he admitted
hitting B.C. in the head.  The jury, as the trier of fact, was the sole judge
of the credibility of the witnesses and of the weight to be given to their
testimony.   Tex. Code Crim. Proc. Ann.
art. 36.13 (Vernon 2007), art. 38.04 (Vernon 1979).  As such, the jury was free
to believe or disbelieve all or any part of any witness=s testimony.  Sharp v. State, 707
S.W.2d 611, 614 (Tex. Crim. App. 1986).   We find that the evidence is legally
and factually sufficient to support the conviction.  Appellant=s third issue on appeal is
overruled.  

In
his first and second issues on appeal, appellant makes complaints regarding juror
separation after deliberations had begun.  After the jury found appellant
guilty, it began to deliberate upon his punishment.  While they were
deliberating, appellant discovered that, during the lunch break, the bailiff
allowed one of the jurors to separate from the other jurors so that that juror
could smoke his pipe.  Appellant also discovered that, during guilt/innocence
deliberations, the trial court had allowed that same juror to separate from the
rest of the jurors for the same reason.  Appellant moved for a mistrial at that
time, but the trial court took the motion under advisement and allowed the jury
to continue its deliberations.








After
the jury completed its deliberations, the trial court heard testimony on
appellant=s motion for
mistrial.  Steve Smith, the bailiff, testified that, during the guilt/innocence
phase of trial, a juror asked to be allowed to smoke.  The trial court allowed
the juror to smoke; Smith remained  with the other jurors.  The following day
during deliberations in the punishment phase, the juror again asked to be
allowed to smoke.  Without consulting the trial court, Smith allowed the juror
to smoke.  The trial court was unaware of the juror=s subsequent request for a smoke break during
the punishment phase.

Smith
further testified that in each instance, when the juror was allowed to
separate, the other jurors were in the  break room for lunch and were not
conducting deliberations.  Smith said that the trial court instructed the
jurors not to deliberate during the lunch break.  Smith remained with the other
eleven jurors; they did not discuss the case in the juror=s absence.  The juror in
question also testified that he did not talk to anyone while separated from the
other jurors and that he did not discuss the case with anyone.

Tex. Code Crim. Proc. Ann. art. 35.23
(Vernon 2006) provides in relevant part:

When jurors have
been sworn in a felony case, the court may, at its discretion, permit the
jurors to separate until the court has given its charge to the jury.  The court
on its own motion may and on the motion of either party shall, after having
given its charge to the jury, order that the jury not be allowed to separate,
after which the jury shall be kept together, and not permitted to separate
except to the extent of housing female jurors separate and apart from male
jurors, until a verdict has been rendered or the jury finally discharged. . . .
In any case in which the jury is permitted to separate, the court shall first
give the jurors proper instructions with regard to their conduct as jurors when
so separated.  

 

Prior
to the change in Article 35.23, jurors were not allowed to separate after the charge
had been read to them, unless the parties agreed to the separation.  Now,
Article 35.23 no longer prohibits separation of the jury after the charge has
been read.  Sanchez v. State, 906 S.W.2d 176, 178 (Tex. App.CFort Worth 1995, pet. ref=d & pet. dism=d). The court may, in its
discretion, or shall, at the request of a party, sequester the jury.  Sanchez,
906 S.W.2d at 178.  A party waives the right to have the jury sequestered
unless the party makes a timely request to sequester the jury.  Keiser v.
State, 880 S.W.2d 222, 223 (Tex. App.CAustin
1994, pet. ref=d).  A
timely request is one that is made either before jury deliberations begin or
before the jury is allowed to separate.  Keiser, 880 S.W.2d at  223.  If
there is no such request, it is within the trial court=s discretion to allow the jury to separate. 








Appellant
argues that he was not allowed the opportunity to move to sequester or to
object to the separation.  To the contrary, appellant could have moved to
sequester at any time before the jury separated.  However, appellant did not at
any time before the jury separated request that the jury be sequestered. 
Therefore, he waived his right to have the jury sequestered.  The trial court
did not err when it overruled the motion for mistrial.[1] 
Appellant=s first and
second issues on appeal are overruled.  

The
judgment of the trial court is affirmed.

 

 

JIM R. WRIGHT

CHIEF JUSTICE

 

October 29, 2009

Publish.  See
Tex. R. App. P. 47.2(b).

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.









[1]No complaint is made that the trial court abused its
discretion in deciding to allow the jury to separate.