**Opinion filed May 20, 2010**



## In The

# Eleventh Court of Appeals

_____

## No. 11-08-00202-CR

_____

## RICHARD L. CAMPBELL, Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 90th District Court**

**Stephens County, Texas**

**Trial Court Cause No. F31,156**

### M E M O R A N D U M   O P I N I O N

The jury convicted Richard L. Campbell of the sexual assault of P.D., a child younger than seventeen years of age, by penetrating the child's anus with his sexual organ and assessed punishment at twenty years in prison. Appellant's issue on appeal asserts that the evidence was legally and factually insufficient to support his conviction. We affirm.

*Standard of Review*

To determine if the evidence is legally sufficient, we must review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979); *Jackson v. State*, 17 S.W.3d 664 (Tex. Crim. App. 2000).

To determine if the evidence is factually sufficient, we must review all of the evidence in a neutral light. *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006) (overruling in part *Zuniga v. State*, 144 S.W.3d 477 (Tex. Crim. App. 2004)); *Johnson v. State*, 23 S.W.3d 1, 10-11 (Tex. Crim. App. 2000); *Cain v. State*, 958 S.W.2d 404, 407-08 (Tex. Crim. App. 1997); *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996). Then, we must determine whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Watson*, 204 S.W.3d at 414-15; *Johnson*, 23 S.W.3d at 10-11. We must also give due deference to the jury's determinations of fact, particularly those determinations concerning the weight and credibility of the evidence. *Johnson*, 23 S.W.3d at 8-9. The jury, as the trier of fact, was the sole judge of the credibility of the witnesses and of the weight to be given to their testimony. TEX. CODE CRIM. PROC. ANN. art. 36.13 (Vernon 2007), art. 38.04 (Vernon 1979). As such, the jury was free to believe or disbelieve all or any part of any witness's testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986).

In reviewing the evidence in this case, we must keep in mind that the testimony of a child complainant, if believed by the jury, is legally and factually sufficient to support a conviction for sexual assault. TEX. CODE CRIM. PROC. ANN. art. 38.07 (Vernon 2005) (sexual assault conviction is supportable on uncorroborated testimony of victim of sexual offense seventeen years of age or younger); *Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd).

*Background Facts*

Appellant was a friend of P.D.'s grandparents who lived in Graham. In July 2006, P.D. was visiting his father in Breckenridge. At the time, P.D. lived with his mother in Haltom City. The State's witnesses and appellant's witnesses (including appellant) agreed that P.D., a fourteen-year-old boy, appeared to have a form of autism and was less developed mentally than other children his age. On the day in question, appellant picked P.D. up and took him to appellant's house by the lake to go swimming while P.D.'s father was at work. In October 2006, P.D. made an outcry to his uncle, telling him about the actions of appellant that day that the jury found to have been the elements of the offense of sexual assault.

George W. (Billy) Wade, the chief deputy in the Stephens County Sheriff's Office, testified that on October 20, 2006, he received a report regarding the alleged sexual assault of P.D. Deputy Wade telephoned P.D., but quickly realized that P.D. had a learning disability that was more severe than he had understood from P.D.'s father. Deputy Wade decided that someone skilled in interviewing children should interview P.D. When investigating an alleged sexual assault of a child, Deputy Wade stated that he uses the Advocacy Center called the Virginia House because it is a center for coordinating the efforts of law enforcement, Child Protective Services, the prosecution, and medical personnel. He explained that the interview is conducted by a forensic interviewer who is extensively trained in interviewing victims of sexual assault. Only the alleged victim and the interviewer are in a room that is comfortable for children, while the investigator and personnel of Child Protective Services are in another room where they can view the interview on video equipment as it records the interview.

After observing the forensic interview, Deputy Wade determined that, if P.D. was telling the truth, he had been sexually abused both anally and orally. He said that, during the interview, he looked for factors that he could use in an investigation to determine whether P.D. was telling the truth. Deputy Wade stated that there were four things that P.D. had told the interviewer and that he had subsequently confirmed: (1) that appellant had shown P.D. a pornographic movie on a VCR in the living room; (2) that the videotape was fuzzy and jumped up and down; (3) that appellant had shown P.D. a pornographic magazine in the living room; and (4) that appellant had shown P.D. guns that were in a gun cabinet in appellant's bedroom. In addition, Deputy Wade said that he confirmed that appellant kept the magazine between the two "mattresses" on the bed, just as P.D. had told the interviewer.

After viewing the forensic interview, Deputy Wade contacted appellant at his place of employment, a nursing home, where appellant's wife was the director of nursing. Appellant and his wife Jill Judy Campbell went to Deputy Wade's office on October 27, 2006. Deputy Wade said that, at first, appellant told him that appellant had only been around P.D. when others were around but subsequently told Deputy Wade that he had been alone with P.D. once. On that occasion, they went swimming in the lake, and then he took P.D. home. When Deputy Wade asked appellant if they were ever in appellant's house, appellant said they were not. Appellant later changed that to a statement that they had gone into the house and "hung out a little bit and he took [P.D.] home." Appellant said that his wife was at work that day. Deputy Wade said that,

3

when he asked appellant if the two of them had any kind of contact, appellant said that "they wrestled in the floor, but nothing happened, and then he took [P.D.] home."

Deputy Wade recalled that, at that point in the interview, appellant had not asked him what P.D. said appellant had done to him. Appellant became very nervous when Deputy Wade asked him why he had not asked what P.D. had said. Appellant even stated that he was nervous. Deputy Wade said that he told appellant that appellant had changed his story numerous times within ten to fifteen minutes, and Deputy Wade wanted to know why it was so hard for appellant to remember what happened on that day. Appellant became even more agitated.

Deputy Wade asked appellant if he had a pornographic video and a pornographic magazine. Appellant said that he did and that Deputy Wade could have them. Appellant signed a written consent to search, and it was introduced as State's Exhibit 1. Deputy Wade then went with appellant and his wife to their residence. He first observed that there was a television with a VCR in the living room and that there was a gun cabinet with guns in the bedroom just as P.D. had described. Deputy Wade described the magazine as being much more pornographic than Playboy or magazines of that type. He stated that the magazine was "titled Prude, and it shows men and women engaging in oral, vaginal, and anal --." At that point, defense counsel made a hearsay objection that was sustained. After counsel's best-evidence-rule objection, the State introduced the magazine as State's Exhibit 2. Deputy Wade then described the magazine as showing men and women engaging in oral, vaginal, and anal intercourse and said that it was consistent with what P.D. had described to the forensic interviewer.

Deputy Wade testified that appellant handed him a pornographic VHS tape and that P.D. had described the tape as a DVD. According to Deputy Wade, appellant said that he had not shown the movie or the magazine to P.D. but that at times the magazine stayed by the chair in the living room and, perhaps, P.D. may have seen the magazine. A black VHS tape containing the pornographic movie was then introduced as State's Exhibit 3. Deputy Wade then stated that, in addition to showing pornographic activity, the VHS tape also jumped up and down, just as P.D. had described to the interviewer. During that interview, P.D. had referred to "Radar," and Deputy Wade confirmed that "Radar" was a nickname for appellant.

P.D. was the second witness. He testified that he was sixteen years of age, attended the tenth grade at Haltom High School, and lived with his mother, brother, and grandparents. P.D. said that Radar lived on County Road 214 out on a lake. Because his father went to work that

4

day, P.D. went to Radar's house. P.D. said that, after they went swimming, they went into the house and that Radar showed him a porno magazine. They also watched a porno movie. P.D. remembered telling the interviewer that the movie was on a CD, but he testified at trial that it was on a VHS tape. They watched "[a]bout 30 minutes because [the tape] was messing up" by "jumping around."

At some point, he and Radar went into the bedroom. In the bedroom, "[Radar] had [P.D.] bend over on the bed and he was sucking on [P.D.'s] penis." Radar then placed P.D. on his stomach, and Radar humped him from behind. P.D. described appellant's actions and stated that he asked appellant to stop two times and that appellant stopped after the second time. He also said that the penetration hurt. P.D. testified that Radar asked him to put Radar's penis in his mouth but that P.D. had refused. After that, they went back to the lake to swim again, and "[Radar] was messing with me in the lake." He remembered Radar showing him guns in the bedroom but said that Radar did not threaten him. However, P.D. said that he felt threatened by the guns because "they were powerful." P.D. said that Radar told him not to tell anybody about what had happened. He said that the first person that he talked to about Radar's actions was his uncle and that he also told his aunt.

During cross-examination, P.D. said that his favorite class in the tenth grade was science. When asked if he had talked to the prosecutor about his testimony, P.D. said that he had not. He said that he had gone to counseling in Fort Worth. When asked why he did not continue counseling, P.D. testified, "[Because] I'm just too nervous." P.D. acknowledged that in his direct testimony he had left out the fact that he had shot the guns with Radar on that day behind Radar's house. We note that the prosecutor had not asked P.D. about shooting the guns on direct examination.

P.D. testified that Radar had retrieved the magazine from between the two mattresses on the bed and that they had looked at the magazine together in the living room. He said that he told the interviewer that the video was a DVD and that, at the time, he did not understand the difference between a DVD and a VHS. In explaining his understanding at the time of trial, P.D. testified: "A tape . . . goes in a VCR. A DVD is just a CD."

When appellant's counsel asked if P.D. remembered telling the interviewer that Radar had begun to suck on his penis in the living room before going into the bedroom, P.D. said that was how it happened. He said that he "just got a little confused" in his testimony on direct but

5

that Radar had also given him a "blow job" on the bed. P.D. also testified that Radar had put Vaseline on him and on himself just before Radar had started humping him. He also testified that he did not see Radar have an erection but that it hurt when Radar penetrated him. Defense counsel pointed out to P.D. that, in the interview, P.D. had said that, after being in the bedroom, he and Radar had gone back to the living room where they both had masturbated. P.D. said that that did happen.

Donna Ann Wright, a sexual assault nurse examiner at Cook Children's Medical Center, testified that she examined P.D. on November 8, 2006. She noted that P.D. was three to four years behind other children in development; therefore, at fourteen years of age, he acted as if he were nine to eleven years in age. Wright asked P.D. if anyone had ever touched him in a way that made P.D. feel uncomfortable. P.D. said that the first person was named Dale who had humped him and sucked on his thing. The other person was Radar who was in Breckenridge: "There was a magazine, then there was a video, and then that's when he started sucking. That was Radar. He put Vaseline on me and him." Wright asked P.D. for specific details. P.D.'s statements to her were consistent with his trial testimony and what P.D. told the interviewer. Wright said that P.D. had detailed knowledge of what happened that day and that normally a child of that age would not be talking about those things.

Wright did state that P.D. is easily distracted. She admitted that he could be confused easily because he was so easily distracted while talking. Wright found no trauma on P.D.'s body but was not surprised because it had been such a long period of time since the alleged events. In particular, she noted that P.D. had said that Radar used lubrication and that use of lubrication would have decreased the chances of finding any physical effects. In anal examinations, there was usually less than a five percent chance of finding any physical evidence.

After Wright's testimony, the prosecutor recalled Deputy Wade for a few more questions. He asked Deputy Wade where appellant had retrieved the magazine from when they went to appellant's house. Deputy Wade said that it was located in appellant's bedroom between the mattress and box springs. Deputy Wade said that he saw appellant retrieve the magazine from that spot. He also said that there often is a delayed outcry by children because they are afraid they have done something wrong or that they are in trouble.

Jill Judy Campbell, appellant's wife, was the first defense witness. Her testimony made it apparent that, in addition to pointing out conflicts in the testimony for the State, the defensive

6

theory was that appellant had erectile dysfunction and, therefore, could not have done what P.D. said that he did. Jill testified that she checked her calendar and determined that she and appellant were at the Elks Lodge on July 26. P.D., his father, and P.D.'s grandmother and step-grandfather were also there. She and appellant were close friends with P.D.'s grandparents. She said that P.D. had asked her and appellant if he could go swimming the next day and that P.D.'s father gave his consent. She said that appellant had driven her to work the next day and that then he planned to pick up P.D. for the swim. The swim was on Thursday, and they were all at the lodge again on Friday. It was then arranged that P.D. and his dad would go fishing with appellant on Saturday.

Jill Campbell testified that she and appellant were active sexually every day when they first married eleven years ago. But several years ago, appellant had stents put in to correct a heart problem. After that, appellant could not have an erection. They tried many nights but finally gave up. She described her husband as having a small penis – "quarter to a half an inch" – and testified that he "[m]ostly . . . sits" when he uses the bathroom. She said that the last time they had sex was about three years ago. She also stated that she had never seen appellant do anything inappropriate around children or have homosexual tendencies. She agreed that P.D. was "mentally compromised."

Dr. Rachael Kendra Dabelic, a physician in Stephens County, also testified for appellant. Appellant became a patient of hers on September 15, 2006, which was after the alleged incident. She confirmed that he had been diagnosed as having coronary artery disease and that stents had been put in appellant in March 2006. She testified that appellant takes a beta blocker that could contribute to erectile dysfunction and that appellant had complained to her about having erectile dysfunction. Dr. Dabelic said that there was no test for erectile dysfunction and admitted that she did not know if the beta blocker caused him to have that problem or not.

A friend of appellant, Gary Neely, testified that he had grandchildren who had gone swimming at appellant's house. He said that he had never seen appellant act inappropriately with the children.

Appellant then took the witness stand. He denied that he had done anything to P.D. He said that P.D. was with him much longer than two hours. He had picked P.D. up after he took his wife to work at 8:30 a.m., and they swam until noon. Appellant then made P.D. a sandwich and gave him a glass of Crystal Lite diet lemonade. He gave P.D. that drink because P.D. did not

need sugar; P.D. would have been bouncing off the walls if he had been given a drink with sugar. After lunch, they shot guns and then watched a movie; however, it was not a pornographic movie. They cleaned the guns, which took forty-five minutes. Then, they went swimming again. Appellant confirmed what his wife had said about their sex life. He said that his penis had stopped working sexually shortly after he had the stents put in. Appellant said that he did not remember when the stents were put in but that it was approximately three or four years ago.

Appellant disagreed that Deputy Wade told him of the charge at his place of employment. It was not until he went to Deputy Wade's office for the interview that Deputy Wade told him of the charge. Appellant testified that the magazine was always kept beside his chair in the living room. He also stated that it was P.D.'s idea that P.D., his dad, and appellant would go fishing that Saturday after the alleged event.

During cross-examination, appellant agreed that he took P.D. swimming and that his wife was working that day. He also agreed that it was the first time P.D. had been to his house alone. Appellant denied that the magazine had ever been between the mattresses. He further testified that he has several old tapes that have tracking problems that make them jump. Appellant agreed that the video and magazine showed "humping and sucking" but that he had not shown them to P.D. On redirect, appellant conceded that P.D. might have seen the magazine but that P.D. would not have seen the video. He also said that he had a very close relationship with P.D.'s grandmother but did not know P.D.'s father very well.

Appellant also testified that he had other magazines like Playboy but that they were not hardcore like the magazine he gave Deputy Wade. He maintained that he kept them underneath the bedside table. In answer to a question by the prosecutor, he stated that, on the day in question, the magazine was beside his recliner in the living room but that it usually was kept underneath the bedside table.

*Analysis*

The jury was the trier of fact. It was the sole judge of the credibility of the witnesses and of the weight to be given to their testimony. The jury was free to believe or disbelieve all or any part of any witness's testimony. *Sharp*, 707 S.W.2d at 614. Although there were conflicts in P.D.'s testimony, we found no reason to not give due deference to the jury's determinations of fact. Contrary to appellant's assertion, P.D. did testify at trial that appellant had put Vaseline on both of them just as he had told the sexual assault nurse. P.D. also testified at trial that they had

masturbated when they returned to the living room, just as P.D. told the nurse. Appellant also argues that P.D. testified first that the sexual assault happened in the bedroom and then said that it started in the living room. That is not accurate. In reviewing the testimony, we find that the prosecutor during direct testimony only asked about what happened in the bedroom. During cross-examination, P.D. said that he did remember telling the interviewer that Radar began sucking his penis in the living room. There was no conflict in P.D.'s testimony about where the assault started; the prosecutor had not asked him where it started.

Appellant points out that P.D. did not identify the magazine and video at trial. Appellant could have requested P.D. to do so. In identifying the magazine and video as exhibits, Deputy Wade described the magazine and video and said that they were as P.D. had described them to the forensic interviewer. Deputy Wade also testified that appellant retrieved the magazine from between the mattress and box spring for Deputy Wade; that was the same place that P.D. said appellant kept the magazine.

Appellant and his wife testified that he could not have an erection. Jill Campbell described appellant's penis as being a "quarter to a half an inch." The jury apparently did not believe the testimony of appellant and his wife. Appellant became Dr. Dabelic's patient in September 2006. Dr. Dabelic testified that her records reflected that the stents had been placed in appellant in March 2006. Although appellant complained to her about erectile dysfunction, Dr. Dabelic said that she did not know whether appellant had it or not. Jill Campbell testified that, after the stents were put in, they tried to have sex many, many nights and finally gave up because appellant could not have an erection. The alleged sexual assault of P.D. occurred in July 2006. P.D. testified that he did not see appellant have an erection, that he did not remember whether appellant's penis was erect or soft, that appellant had penetrated him just a little, and that it hurt.

We find that the evidence was legally sufficient. A review of the evidence in the light most favorable to the verdict reveals that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson*, 443 U.S. 307; *Jackson*, 17 S.W.3d 664. We also find that the evidence was factually sufficient. The evidence supporting the verdict was not so weak that the verdict was clearly wrong and manifestly unjust nor was the verdict against the great weight and preponderance of the conflicting evidence. *See Watson*, 204 S.W.3d at 414. Appellant's issue on appeal is overruled.

9

*This Court's Ruling*

The judgment of the trial court is affirmed.


TERRY McCALL

JUSTICE


May 20, 2010

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of:  Wright, C.J.,
McCall, J., and Strange, J.